UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LINDA S. FRAME, | CASE NO. 1:22-CV-01693-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | |

## INTRODUCTION

Plaintiff Linda S. Frame challenges the decision of the Commissioner of Social Security denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On September 21, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Sept. 21, 2022). On November 18, 2022, the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #7). Following review, and for the reasons stated below, I **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Frame previously filed for DIB and SSI in 2017, alleging a disability onset date of October 5, 2016. (Tr. 70). The ALJ issued a written decision in that case on May 2, 2019, finding Ms. Frame not disabled. (Tr. 67-84).

1

Ms. Frame again filed for DIB on April 3, 2020 and SSI on April 10, 2020, alleging in each instance a disability onset date of October 4, 2016. (Tr. 229-42). Her claims were denied initially and on reconsideration. (Tr. 85-86, 105-06). She then requested a hearing before an administrative law judge. (Tr. 149-50). Ms. Frame (represented by counsel), and a vocational expert (VE) testified before the ALJ on May 24, 2021. (Tr. 33-66). On August 10, 2021, the ALJ issued a written decision finding Ms. Frame not disabled. (Tr. 14-32). The Appeals Council denied Ms. Frame's request for review, making the hearing decision the final decision of the Commissioner. (Tr.1-4; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Frame timely filed this action on September 21, 2022. (ECF #1).

## FACTUAL BACKGROUND

### I.    PERSONAL AND VOCATIONAL EVIDENCE

Ms. Frame was 41 years old on her alleged onset date, and 46 years old at the administrative hearing. (Tr. 229). She completed her GED and has worked as an in-home caregiver. (Tr. 95; 43).

### II.    RELEVANT MEDICAL EVIDENCE

#### A.    Physical Health

Ms. Frame sought care with her primary care provider, Alicia Blacksmith, N.P., for physical complaints in November 2019. (Tr. 496-99). She experienced panic that day because her fasting glucose was 265 mg/dL but planned on meeting with a nutritionist soon to adjust her diet. (*Id.*). She denied any past falls and exhibited normal range of motion, strength, sensation, and gait with no focal motor deficits. (Tr. 496-97). NP Blacksmith agreed to wait three months to check Ms. Frame's A1C again before adjusting her insulin. (*Id.*). When Ms. Frame returned in January 2020,

she had no diabetes-related complaints, again denied a history of falls, and continued to exhibit normal range of motion, strength, sensation, and gait with no focal motor deficits. (Tr. 500-01). As a result, NP Blacksmith made no changes to Ms. Frame's diabetes regiment. (Tr. 501).

In September 2020, Ms. Frame underwent a consultative examination with Branden King, D.O. (Tr. 438-47). She reported being diagnosed with diabetes in 2013, for which she requires insulin. (Tr. 438). She took no oral medications and had never been hospitalized due to diabetes, but indicated her blood glucose and A1C remain elevated, acknowledging she did not follow a diabetic diet or exercise regularly. (*Id.*). She reported neuropathy in both feet, making it difficult to stand and walk, but exhibited normal gait on examination with a negative Romberg test (a balance test). (Tr. 441). She displayed normal range of motion and grip strength. (Tr. 444). She showed decreased sensation to light touch at the bilateral soles of the feet and at the left thenar eminence, but Tinel's sign and Phalen's test (to detect carpal tunnel) were negative. (Tr. 441). Dr. King observed Ms. Frame's ability to lift, carry, and handle light objects, including normal fine and gross manipulation abilities. (*Id.*). She could squat and rise easily, get up and down from the exam table, walk on heels and toes, and stand and hop on one foot bilaterally. (*Id.*).

Dr. King opined Ms. Frame had no limitations in sitting, standing, walking, bending, stooping, crouching, squatting, reaching, grasping, handling, fingering, or feeling. (Tr. 442). She did not need an assistive device to ambulate short or long distances or rough terrain, did not have significant limitations with lifting or carrying weight, and had no relevant visual, communicative, or workplace environmental limitations. (*Id.*).

At a September 2020 consultative psychological examination, Ms. Frame exhibited normal posture, motor behavior, and gait. (Tr. 453). Ms. Frame returned to see NP Blacksmith in

December 2020 for a diabetes check. (Tr. 458-64). She again denied a history of falls, and her examination showed normal range of motion, strength, sensation, and gait with no focal motor deficits. (Tr. 458-59). NP Blacksmith advised Ms. Frame to make dietary changes because her A1C was 9.9, but otherwise made no changes to her diabetic regimen. (*Id.*).

### B.    Mental Health

Ms. Frame saw Jason Davis, LPCC, at weekly counseling sessions for two years until May 2020, when LPCC Davis left his practice and Ms. Frame declined to transfer to another therapist. (Tr. 331-36). Her mental health treatment records demonstrated situational stressors, including her initial social security application and denial (Tr. 347, 421), her presence in a store where a man entered and shot himself, creating a fear of going to the store (Tr. 350, 391, 399, 401, 420), relationship issues (Tr. 350, 352-53, 361, 368, 377, 381-82, 386-87, 390-92, 394, 398, 401, 405-06, 410, 418), trauma related to her prior work as a caregiver (Tr. 352-53, 386, 413), physical health concerns (Tr. 346, 350-52, 377-79, 381-82, 384, 398, 403, 413, 415), and the death of her father in June 2018 (Tr. 409, 413) and her mother in January 2020 (Tr. 353-54, 359, 363). While Counselor Davis noted on a few occasions that Ms. Frame had made "no progress" (Tr. 377, 389, 406, 415), he more often indicated she was making "some progress" (Tr. 341, 350, 352, 353, 355, 357, 359, 361, 363, 368, 371, 374, 381-83, 386-87, 391-92, 394-95, 398, 401, 409-10, 418, 421) or "good progress" (Tr. 405, 413).

In June 2019, she left an appointment prior to being seen after having a panic attack. (Tr. 411-12). In March 2020, she reported experiencing anxiety on the way to the appointment, which she was able to manage with the use of Xanax. (Tr. 353).

Ms. Frame also regularly saw a case manager, Jacqulyn Holton, at Charak Center for Health and Wellness. (Tr. 331). On a few occasions, Ms. Holton described Ms. Frame as anxious (Tr. 342, 351, 364-65, 369, 419); however, Ms. Holton generally described Ms. Frame as engaging with a stable mood, appropriate behavior, logical thought processes, and fair hygiene (Tr. 331-34, 336, 338-40, 343-45, 347, 349, 354, 356, 358, 360, 362, 366, 372-73, 375, 378-79, 384, 388, 390, 393, 396, 399, 402-03, 407, 414, 416-17, 419, 422). On multiple occasions, Ms. Frame reported her treatment regimen reduced her anxiety and panic attacks. (Tr. 341, 383, 389, 391, 395). Records indicate she could participate in various activities that improved her mood, including celebrating the graduation of her boyfriend's son and enjoying the day with her family after her initial anxiety "disappeared" (Tr. 418); reaching out to neighbors to formulate a plan to rescue a racoon in her backyard and being successful in releasing it back to the wild, "which gave her peace for the rest of the weekend" (Tr. 414); and cleaning her mother's apartment after she passed away (Tr. 359). In October 2019, she also reported being entertained by the different personalities she encountered while in the waiting room prior to her appointment, at which time Ms. Holton commented on Ms. Frame's progress, as she used to have panic attacks and sometimes left before her appointments. (Tr. 388).

In a Mental Impairment Questionnaire dated March 2020, Counselor Davis indicated he had treated Ms. Frame weekly since January 2019 for diagnoses of PTSD, generalized anxiety disorder, major depressive disorder, and panic disorder. (Tr. 326-27). He stated her medications included Xanax and Paxil, which caused an upset stomach. (Tr. 326). Counselor Davis relayed Ms. Frame's mental status was good, but noted she has panic attacks nearly daily, fears leaving the house, and is easily overwhelmed. (Tr. 326). He opined Ms. Frame has an "unlimited or very good"

ability to understand, remember, and carry out very short and simple instructions as well as detailed instructions; work in coordination with or in proximity to others without being distracted by them; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 326-27). He further opined Ms. Frame has a "limited, but satisfactory" ability in the following areas: maintain attention and concentration for extended periods; perform activities within a schedule; sustain an ordinary routine without special supervision; remember locations and work-like procedures; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others. (Tr. 326-27). Counselor Davis opined she is "seriously limited, but not precluded" in the ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 326). He opined that Ms. Frame is "unable to meet competitive standards" in the following areas: manage regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; and respond appropriately to changes in the work setting. (Tr. 326-27). Counselor Davis also opined she has no useful ability to function in interacting appropriately with the general public, would likely miss two days of work per week due to her impairments, and would likely be off task for 10-15 minutes every hour. (Tr. 327).

In September 2020, Ms. Frame attended a consultative examination with Deborah Koricke, Ph.D. (Tr. 449-57). Ms. Frame conveyed she worked as a caregiver her whole life until October 2016, when she stopped working because the toll of caring for her last patient, who she

had to resuscitate many times, was too much on her. (Tr. 451). Ms. Frame denied a history of suicidal ideation or psychiatric hospitalization. (*Id.*). She reported seeing a therapist weekly and getting Paxil and Xanax from her primary care physician, but she was on a wait list to see a psychiatrist. (*Id.*).

Ms. Frame endorsed sleep difficulties, which had been going on "forever," as well as a loss of appetite, anxiety ("extreme" when she has to leave the house), panic attacks, irritability, a startle response, restlessness, and constant worry. (*Id.*). She denied cognitive symptoms. (Tr. 452). Dr. Koricke reviewed treatment notes from Counselor Davis and Ms. Holton; however, she pointed out none of the notes indicated Ms. Frame's diagnosis or her prescribed medications. (Tr. 449).

On examination, Ms. Frame appeared slightly anxious, but was pleasant, cooperative, and never tearful. (Tr. 452). Dr. Koricke noted good eye contact good, appropriate insight, good judgment, and average cognitive functioning. (Tr. 453-54). Ms. Frame's thought process was coherent and goal directed, and she could recall 3 of 3 objects immediately and after a delay. (Tr. 453). Dr. Koricke diagnosed Ms. Frame with a panic disorder; other specified depressive disorder; and other specified personality disorder with dependent and borderline features; however, she noted Ms. Frame did not meet the full criteria for a diagnosis of PTSD. (Tr. 454-55). She opined Ms. Frame is able to understand, remember, or carry out instructions; maintain attention and concentration (though her ability to do this when she is highly anxious appeared to be compromised); complete simple and multi-step tasks (but reported little motivation to do so because of her depression); respond appropriately to supervisors and co-workers; and respond appropriately to work pressures. (Tr. 455-56).

Ms. Frame returned to see Counselor Davis on April 7, 2021 and continued therapy with him until May 13, 2021. (Tr. 521-36). He completed another mental impairment questionnaire on May 10, 2021, in which he reported diagnoses of panic disorder with agoraphobia and generalized anxiety disorder. (Tr. 521). He reported she took Paxil, Xanax as needed, and sees a nurse practitioner to manage her medications. (*Id.*). His clinical findings included poor concentration, distractibility during sessions, and a "flight of ideas," describing a mild to moderate improvement with regular therapy. (*Id.*).

## III.   MEDICAL OPINIONS

Diane Manos, M.D., reviewed Ms. Frame's medical history at the initial level and adopted the RFC from Ms. Frame's previous application, found within the ALJ's May 2, 2019 decision. (Tr. 92). That RFC included the following limitations:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She should avoid the use of moving machinery, commercial driving, and unprotected heights. She is limited to performing unskilled (SVP 1-2) work. She is limited to a work environment that is free of fast-paced production requirements and involves only routine work place changes. She can have occasionally[*sic*] public contact and occasionally[*sic*] interaction with coworkers. The claimant is limited to superficial contact with others, defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others.

(Tr. 74). Lynne Torello, M.D., reviewed the record on reconsideration and affirmed Dr. Manos' conclusion. (Tr. 112-13).

Mary Hill, Ph.D., reviewed Ms. Frame's psychological history at the initial level. (Tr. 90). She reviewed the medical opinions the ALJ relied on in the previous case, as well as the ALJ's May

2, 2019 decision. (*Id.*). Dr. Hill found those opinions should not be adopted because of the diagnosis in the file. (*Id.*).

Dr. Hill found Ms. Frame moderately limited in her abilities to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 93). Dr. Hill noted Ms. Frame is "highly anxious" and her anxiety "may limit her ability to focus for sustained periods" but she is able to complete tasks with no strict production requirements. (*Id.*). Dr. Hill found moderate limitations in her abilities to ask simple questions or request assistance, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 93-94). Dr. Hill also identified a moderate limitation in the ability to respond appropriately to changes in the work setting. (Tr. 94).

Courtney Zeune, Psy.D., evaluated Ms. Frame's medical history on reconsideration, finding it established the presence of severe medically determinable impairments that would affect her ability to function and work, but were only partially consistent with Ms. Frame's alleged symptoms and limitations. (Tr. 110-11). Dr. Zeune agreed with Dr. Hill's assessment. (Tr. 114).

IV.  **ADMINISTRATIVE HEARING**

Ms. Frame and VE Lynn Smith testified at a hearing on May 24, 2021 before the ALJ. (Tr. 33).

Ms. Frame lives with a friend and his son. (Tr. 44). She has no children, is not currently employed, and has no source of income. (*Id.*). She receives food assistance and medical insurance through public benefits. (Tr. 45).

Ms. Frame believes she is disabled due to her diabetes, panic attacks, and neuropathy. (Tr. 46-47). Her A1C recently rose from 9 to 10.4. (Tr. 46). She tries to manage her diet but often does not feel like eating or will eat unhealthy food. (Tr. 47). She experiences burning pain in both feet that improves with elevation but returns immediately upon lowering her feet back down. (*Id.*). She spends three to four hours a day with her feet elevated. (Tr. 48). The neuropathy makes it hard to stand and walk; she only walks between rooms and walking a block or two would be "very hard." (*Id.*). She tries to move back and forth between feet to take pain off of one side at a time, but it is too excruciating. (Tr. 49).

Ms. Frame has trouble with her vision, which blurs when her blood sugar is high, causing confusion. (*Id.*). She experiences vertigo symptoms once a day lasting five minutes. (*Id.*). She gets nauseous, which is also brought about by her diabetes. (Tr. 50). Although she has never fallen as a result of the vertigo, she has lost her balance. (*Id.*).

Ms. Frame has carpal tunnel syndrome in her left hand only, for which she wears a compression garment. (*Id.*). She is right-handed but does some things left-handed. (*Id.*). She avoids grabbing with her left hand because she will drop things, most recently dropping a jar of jelly that spilled all over the floor. (Tr. 51). She experiences neck pain from a car accident in 1993 and cannot sit or stand for prolonged periods of time without support. (*Id.*). Her neck is often stiff and bothers her on a weekly basis. (*Id.*).

Ms. Frame's anxiety is a significant barrier to her ability to work. (Tr. 52). She quit working due to panic attacks, which have only worsened. (*Id.*). She cannot go to the grocery store and can "barely go outside" because she fears something bad will happen to her. (*Id.*). The problem is exacerbated by her diabetes, because the panic attack feels like having low sugar, and she is worried she is dying. (*Id.*). She sees stars, gets "really hot" and "totally freaks out." (*Id.*). Thinking about resuscitating a patient, her parents' deaths, heroin use, and mixing up her insulin causes her panic attacks. (Tr. 53-54). Leaving the house causes several panic attacks per day, while staying inside causes only one. (Tr. 54). She takes Xanax, which only helps for an hour or two. (*Id.*). She has a hard time focusing, concentrating, and paying attention. (Tr. 55). After a panic attack, she must lie down for one to three hours, and does this every day each week. (Tr. 59).

She does not get along well with others and has rage issues. (Tr. 56). She does not feel comfortable being around people or being in public, and the people she lives with have told her she is always on edge and attacking them. (*Id.*). Ms. Frame is tired all the time. (*Id.*). She is "not doing a great job" at managing her personal hygiene, and the friend she lives with must remind her to do so. (*Id.*). Before the Covid-19 pandemic, she would often get panic attacks in the waiting room of her therapist's office and leave before her appointment. (Tr. 57). She finds therapy helpful. (*Id.*). She takes Xanax for panic and Paxil for concentration. (Tr. 57-58). Ms. Frame does not socialize outside her home. (Tr. 58). She likes flowers and gardening, but currently has no interest and is worried about leaving her house. (Tr. 58).

VE Smith then testified. She identified Ms. Frame's previous employment as home attendant, DOT 354.377-014, SVP 3, medium exertion as listed, but heavy exertion as performed. (Tr. 43).

11

**Hypothetical One.** VE Smith first assumed a hypothetical individual of the same age, educational background, and work experience as Ms. Frame, who can perform the full range of light work subject to the following limitations: frequent handling or fingering bilaterally; occasional climbing of ramps or stairs; never climb ladders, ropes, or scaffolds; never exposed to unprotected heights, hazardous machinery, or commercial driving; limited to simple, routine tasks, not performed at a production rate pace such as in an assembly line setting; limited to simple, work-related decisions; occasional and superficial interactions with supervisors, coworkers, or the general public; tolerate few changes in routine work setting; never be called upon for arbitration, negotiation, confrontation, directing the work of others, rating others, or being responsible for the safety or welfare of others. (Tr. 61-62). This individual cannot perform Ms. Frame's past work but could perform jobs like cleaner (DOT 323.687-014), price marker (DOT 209.587-034), or mail clerk (DOT 209.687-026), all three of which are light exertion, unskilled, SVP 2. (Tr. 62).

**Hypothetical Two.** VE Smith next assumed the same individual from Hypothetical One, but with the addition that the individual requires the freedom to elevate their legs to waist level for two hours out of every workday. (*Id.*). VE Smith testified such a requirement would be work prohibitive. (*Id.*).

**Hypothetical Three.** VE Smith next considered the same individual from Hypothetical One, altered such that the individual can have no interaction at all with coworkers or the general public. (Tr. 63). VE Smith testified there is no work in the national economy such an individual could perform. (*Id.*).

**Hypothetical Four.** Finally, VE Smith assumed the same individual from Hypothetical One, but presumed the individual would be off task 20 percent of the time and would be absent

three times per month. (*Id.*). Again, VE Smith testified such requirements would be work prohibitive. (Tr. 63-64).

Ms. Frame's attorney then asked VE Smith whether work would be available for an individual who required one hour-long, unscheduled break per day to nap due to symptoms of medically determinable impairments. (Tr. 64). VE Smith testified no such work exists. (*Id.*).

### THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2021.

2.  The claimant has not engaged in substantial gainful activity since October 4, 2016, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.  The claimant has the following severe impairments: diabetes mellitus with neuropathy, carpal tunnel syndrome, generalized anxiety disorder, depressive disorder, and posttraumatic stress disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently handle and finger with the bilateral upper extremities. She can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. She can have no exposure to unprotected height, hazardous machinery, or commercial driving. She is limited to simple, routine tasks but not performed at a production rate pace, such as an assembly line. She is limited to simple work-related decisions. The claimant is limited to occasional and superficial interactions with supervisors, co-workers, and the general public, meaning no arbitration, negotiation, confrontation, directing the work others, persuading others, or responsibility for the safety or welfare of others. She can tolerate few changes in a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 15, 1975 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 4, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if

supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures

and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.*

16

Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Ms. Frame bring three challenges to the ALJ's determination: (i) the ALJ erred in failing to find treating source opinions persuasive in formulating the RFC; (ii) substantial evidence does not support the RFC's exertional requirement; and (iii) the ALJ failed to consider symptoms as required by SSR 16-3p. (Pl's Br., ECF #8, PageID 565). I address each in turn, but none of them are sufficient to warrant remand.

**A.    The ALJ properly evaluated opinion evidence.**

Ms. Frame first challenges the ALJ's evaluation of both of Counselor Davis's opinions. (Pl.'s Br., ECF #8, PageID 571). Because Ms. Frame filed her application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. § 404.1520c. Under these revised regulations, the ALJ is to articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at § 404.1520c(b). The regulations define a medical opinion as "a statement from a medical source about what [the claimant] can still do despite [the claimant's] impairment(s) and whether [the claimant has] one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1527(a)(1).

17

The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability[1] and consistency.[2] 20 C.F.R. § 404.1520c(a). An ALJ must explain how he or she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See* 20 C.F.R. §§ 416.920c(b)(2)-(3). That said, just because an ALJ does not specifically use the words "supportability" and "consistency" does not mean the ALJ did not consider those factors. *Hardy v. Comm'r of Soc. Sec.*, No. 2:20-CV-4097, 2021 WL 4059310, at *2 (S.D. Ohio Sept. 7, 2021).

The ALJ in this case analyzed Counselor Davis's medical source opinion as follows:

---

[1]    "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[2]    "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

> Jason Davis, M.Ed., LPCC said that the claimant was unable to meet competitive standards in maintaining regular attendance, completing a normal workday, and responding to changes in the work setting with no useful ability to interact appropriately with the general public. Dr. Davis noted that the claimant had seriously limited ability to maintain a consistent pace without unreasonable rest periods. Mr. Davis later offered other similar assessments. The undersigned finds Mr. Davis' opinion unpersuasive. The record showed that the claimant had ongoing mood and anxiety symptoms, but the evidence did not establish such severe limitations. Indeed, Mr. Davis' own treatment notes were not consistent with his opinion. The claimant was distractible at times, but the balance of the treatment notes showed intact memory and attention, normal thoughts, appropriate behavior, and good insight and judgment. Moreover, Mr. Davis indicated in the treatment notes that the claimant had "moderately impaired" or intact functional status. While such statements were not explained further, the description of "moderately impaired" is incongruent with the degree of impairment he opined.

(Tr. 25) (citations omitted).

The ALJ's explanation makes clear he did not find Counselor Davis's opinion supported by his own examination. The more relevant the supporting explanations presented by Counselor Davis to support his opinion and the more consistent the opinion is with objective evidence, the more persuasive the opinion will be. 20 C.F.R. §§ 404.1520c(c)(2) & (c)(1). Here, the ALJ found a number of problems with Counselor Davis's opinion. As the ALJ indicated, at a general level, although Ms. Frame clearly experienced mood and anxiety symptoms, the record of those symptoms did not align with the severe limitations Counselor Davis proposed. (Tr. 25).

Most notably, the ALJ found Counselor Davis's opinion was both inconsistent and unsupported by his own examination of Ms. Frame and his corresponding treatment notes. For example, the ALJ points out Counselor Davis's treatment notes reflect Ms. Frame was distractable at times, but the balance of his notes reflected intact memory and attention, normal thoughts, appropriate behavior, and good insight and judgment, all of which contradict his opinion Ms.

Frame had "no useful ability in completing a normal workday and workweek without interruptions from psychologically based symptoms." (Tr. 25, 523).

The ALJ also pointed out: "[m]oreover, Mr. Davis indicated in the treatment notes that the claimant had 'moderately impaired' or intact functional status. While such statements were not explained further, the description of 'moderately impaired' is incongruent with the degree of impairment he opined." (Tr. 25). Courts generally agree that although the Social Security regulations do not define a "moderate limitation," it is commonly defined on agency forms as meaning that the individual is still able to function satisfactorily. *Ziggas v. Colvin*, No. 1:13-CV-87, 2014 WL 1814019, at *6 (S.D. Ohio, May 6, 2014).

While Counselor Davis's treatment notes recorded Ms. Frame's functional status as moderately impaired, his proposed limitations were far greater. He opined she would be "unable to meet competitive standards" when it came to managing regular attendance and being punctual within customary tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; and responding appropriately to changes in the work setting. (Tr. 326-27). The ALJ cited this type of inconsistency in his explanation. (Tr. 25).

Contrary to Ms. Frame's assertion, the ALJ did not "fail[] to give a coherent explanation for his reasoning as his rationale failed to view the entire record." (Pl.'s Br., ECF #8 at PageID 577). Rather, he provided logical explanation for his rejection of Counselor Davis's opined limitations based on Counselor Davis's own treatment notes that the ALJ determined were inconsistent with, and not supportive of, the opined limitations.

True, the ALJ did not cite to other record evidence that was consistent with or inconsistent with the opined limitations; however, he did state "[t]he record showed that the claimant had

ongoing mood and anxiety symptoms, but the evidence did not establish such severe limitations."
(Tr. 25). While additional detail would assist on review, it is not necessary for the ALJ to "perform
an exhaustive, step-by-step analysis of each factor." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785
(6th Cir. 2017). Instead, the ALJ need only "provide 'good reasons' for both her decision not to
afford the physician's opinion controlling weight and for her ultimate weighing of the opinion.'"
*Id.* (quoting *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804-05 (6th Cir. 2011)).

Lack of sufficient rationale, internal inconsistency, inconsistency with record evidence, and
lack of support for many of the proffered limitations are all "good reasons" backed by substantial
evidence. *Makela v. Comm'r of Soc. Sec.*, No. 22-1047, 2022 WL 9838285 (6th Cir. Oct. 17, 2022).
Here, the ALJ cited a lack of sufficient rationale, internal inconsistency, and lack of support for the
proffered limitations. Because these are "good reasons" backed by substantial evidence under
*Makela*, I find the ALJ's evaluation of Dr. Davis's opinion in-line with the applicable regulatory
requirements. Ms. Frame's first argument is not persuasive.

**B.** **Substantial evidence supports the ALJ's determination Ms. Frame can perform
work at the light exertional level.**

Ms. Frame next argues the ALJ erred in finding she is capable of performing light exertion
work. (Pl.'s Br., ECF #8, PageID 577). Specifically, she argues the full range of light work requires
standing or walking for a total of approximately six hours out of an eight-hour workday, which she
cannot do.[3] (*Id.*). Ms. Frame argues the evidence supports her having a difficult time standing or

---

[3]     This portion of Ms. Frame's brief is two paragraphs, and the final two sentences
read:

Furthermore, Frame's carpal tunnel evidenced by diminished sensation not light
touch at the left thenar eminence caused her to have difficulty gripping and she

walking, decreased sensation, and neuropathy, which would prevent her from standing six hours. (Tr. 577-78).

In crafting the exertional limitations in the RFC, the ALJ referenced Dr. King's opinion, which found while Ms. Frame had decreased sensation in her feet and the left thenar eminence, she had normal strength, coordination, and gait. (Tr. 25). The ALJ also referenced Ms. Frame's testimony, in which she stated she had burning pain in her feet, elevated her feet for three to four hours per day, and could walk less than a block at a time and stand for only short periods. (Tr. 23). As of January 2019, she had intact sensation, normal musculoskeletal functioning, and was able to exercise twice per day for over fifteen minutes each time. (*Id.*). There are no medical opinions or prior administrative medical findings in the record opining Ms. Frame has any standing, walking, handling, or fingering limitations beyond those included in the RFC. (Tr. 87-104, 441-42). The ALJ acknowledged ongoing treatment for diabetes, but identified only intermittent complaints of neuropathy symptoms, with generally normal gait and strength on exam. (Tr. 26). The opinion concluded: "[t]here was little indication of the severe degree of physical dysfunction the claimant described. Accordingly, the record supported the conclusion that she could perform the reduced range of light work described in the residual functional capacity." (*Id.*).

---

dropped things (Tr. 51). As such, the ALJ's finding that Frame could perform work at the light level of exertion with frequent handling and fingering was not supported by substantial evidence.

(Pl's Br., ECF #8, PageID 578). It is insufficient to cite a single piece of medical evidence and argue it should control the RFC without some attempt at developed argument. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to. . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citing *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir.1995) (citations omitted)). I decline to address this argument.

The ALJ weighed Ms. Frame's testimony about her neuropathy and ability to stand and walk against objective medical findings and medical source opinions, none of which supported the extent of her claimed limitations. While there were inconsistencies between the opinion evidence and testimony regarding Ms. Frame's ability to stand and walk, the ALJ considered both in determining she would likely be capable of performing light work. To the extent substantial evidence also supports Ms. Frame's position, I cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. I therefore find Ms. Frame's second argument unpersuasive.

### C.    The ALJ's analysis of Ms. Frame's symptoms comports with the requirements of SSR 16-3p.

In her final argument, Ms. Frame asserts the ALJ erred in failing to properly evaluate the intensity, persistence, and limiting effects of Ms. Frame's symptoms under SSR 16-3p. (Pl.'s Br., ECF #8, PageID 578). ALJs are to "consider all of the evidence in an individual's record" and determine whether the individual is disabled by examining "all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the individual's record." SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). ALJs also evaluate what the agency formerly termed the "credibility" of a plaintiff's statements about his or her symptoms. *See, e.g., Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 246-49 (6th Cir. 2007). In March 2016, the agency eliminated its use of the term "credibility" and clarified "that subjective symptom evaluation is not an examination of an individual's character. . . ." SSR 16-3p, 2016 WL 1119029, at *1 (rescinding and superseding SSR 96-7p). To avoid such mistaken emphasis, this analysis is now characterized as the "consistency" of a claimant's subjective description of symptoms with the record. *See Lipanye v. Comm'r of Soc. Sec.*,

802 F. App'x 165, 171 n.3 (6th Cir. 2020) (citing *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016)).

Symptom evaluation is a two-step inquiry. First, the ALJ determines if the record contains objective medical evidence of an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms. SSR 16-3p, 2016 WL 1119029, at *3; *see also* 20 C.F.R. § 404.1529(a); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003). Second, the ALJ considers the intensity and persistence of the symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities. *See* 20 C.F.R. §§ 404.1529(a), (c); SSR16-3p, 2016 WL 1119029, at *4. In making this determination, the ALJ considers the following:

- the claimant's daily activities;
- the location, duration, frequency, and intensity of the claimant's pain or other symptoms;
- precipitating and aggravating factors;
- the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate their pain or other symptoms;
- treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;
- any measures used to relieve pain or other symptoms; and
- other factors concerning functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). An ALJ may not consider only objective medical evidence in determining disability unless this evidence alone supports a finding of disability. SSR 16-3p, 2016 WL 1119029, at *5. The regulations at 20 C.F.R. § 404.1529 outline an ALJ's analysis with respect to objective medical evidence as follows:

> *Consideration of objective medical evidence.* Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. Objective medical evidence of this type is a

useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. **However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.**

20 C.F.R. § 404.1529(c)(2) (emphasis added).

It is not enough for an ALJ "simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029, at *9; *see also id.* at *7 (noting that the ALJ "will discuss the factors pertinent to the evidence of record").

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This Court must accord great weight and deference to the ALJ's opinion of subjective evidence, due to the ALJ's opportunity to observe a claimant's demeanor during the hearing—an opportunity this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from them. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ's decision, evaluated as a whole, shows he appropriately considered Ms. Frame's statements about the intensity, persistence, and limiting effects of her symptoms and

offered sufficient reasoning for not accepting those statements. For instance, the ALJ noted that despite her ongoing mood, anxiety, and trauma symptoms, the record did not show the frequency of panic attacks alleged on a continued basis. (Tr. 26). He pointed out that with treatment, Ms. Frame's self-reported symptoms appeared to "stabilize to a large degree." (*Id.*). Similarly, while receiving ongoing treatment for diabetes, she only exhibited intermittent complaints of carpal tunnel and neuropathy symptoms, with generally normal gait and strength on examination. (*Id.*). From this, the ALJ concluded "there was little indication of the severe degree of physical disfunction the claimant described." (*Id.*).

Ms. Frame points to the third-party function report complete by Terry Mushet, Ms. Frame's friend, which reported she was unable to complete tasks, comprehend directions, and performed few activities, with an intense fear of leaving her home. (Tr. 25; Pl.'s Br., ECF #8, PageID 579). The ALJ found this statement persuasive in part "because Mr. Mushet interacted with the claimant regularly." (*Id.*). However, he was "not a disinterested third party" nor a medical professional trained in identifying impairments and associated limitations, and "the record failed to document the degree of limitations he described." (*Id.*).

Ms. Frame analogizes the determination here to the one in *Grames v. Comm'r of Soc. Sec.*, 815 F. App'x 820 (6th Cir. 2019), in which the ALJ largely ignored self-reported symptoms and portions of the medical record. (Pl.'s Br., ECF #8 at PageID 584). The ALJ in this case did not "ignore" or "disregard" Ms. Frame's reported symptoms; rather, he reiterated them and considered them alongside the remaining evidence in the record, which is exactly the kind of consistency inquiry required under SSR 16-3p.

Although Ms. Frame can point to other record evidence supporting a different conclusion, the ALJ's conclusion is, itself, supported by substantial evidence and is sufficiently articulated such that I can follow the path of his reasoning. Ms. Frame has not shown the ALJ failed to consider certain evidence or that he discounted Ms. Frame's statements without reason. Therefore, I decline to remand on this basis.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: July 7, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE